IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY DAWSON,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )    No. 07 C 5574
                                         )
CITY OF CHICAGO, SUSAN JOYNER, JAN       )
ARNOLD, NURIA FERNANDEZ, and ROBERT      )
KELLER,                                  )
                                         )
            Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Anthony Dawson's ("Dawson") second amended complaint
("complaint") alleges race discrimination in violation of section
703(a) of Title VII of the Civil Rights Act of 1964 ("Title VII"),
42 U.S.C. § 2000e-2(a), against the city of Chicago ("City") (count
I); retaliation in violation of Title VII against the City (count
II); constructive discharge in violation of Title VII against the
City (count III); violations of 42 U.S.C. §§ 1981 and 1983 against
the City (count IV); and individual liability under §§ 1981 and
1983 against Susan Joyner ("Joyner"), Jan Arnold ("Arnold"), Nuria
Fernandez ("Fernandez"), and Robert Keller ("Keller") (count V).[1]
The City, Joyner, Arnold, Fernandez, and Keller move for summary
judgment on counts I, III, IV, and V.  Keller and Fernandez also
move for summary judgment on count V.  For the following reasons,

---

[1]On June 10, 2009, plaintiff's claims against Steve
Fecketitsch ("Fecketitsch") were voluntarily dismissed.

defendants' motion for summary judgment is granted in part. I grant summary judgment for defendants on the Title VII, § 1981, and § 1983 hostile work environment claims based on racial harassment in counts I, IV, and V, for the City on count IV, and for Keller on count V. I deny summary judgment for defendants on count III, and for Fernandez on count V.

I.

Dawson is African-American. He has a bachelor of arts degree from the University of Notre Dame. Dawson began working for the City's Budget Department in June 2000 as a Senior Budget Analyst, during which time he did not supervise employees. From 2002 to 2004, Dawson held the title of Fiscal Administrator in the City's Department of Buildings, during which time he did not supervise employees. At some point, the Department of Buildings became the Department of Construction and Permits, and Dawson's title changed to Assistant Commissioner, Head of Strategy. In May 2005, Dawson was appointed to the position of Assistant Commissioner in the City's Department of Aviation ("Aviation"). Initially, Dawson's duties were to help gauge what materials and supplies went in and out of the Aviation warehouse and "we implemented production metric where there was none before." His duties did not include supervising employees. Subsequently, Dawson was appointed Fiscal Administrator.

In December 2005, Dawson became Terminal Manager. Defendants

assert that Dawson "knew that the Acting Terminal Manager position was not a permanent position when he transferred into the position[,]" but the record on this point is not entirely clear. When asked if he was going to be an acting Terminal Manager, Dawson testified that "[e]veryone was acting terminal managers." When asked what his understanding was of the acting process when he agreed to take the position, Dawson testified that he did not "understand acting [] until [he] was in the position." When asked what his understanding was of the acting process once he took the position, Dawson testified that his understanding "[w]as that acting [] was and could be limited in scope with regards to an individual staying in that position long-term." Dawson's last day with Aviation was October 5, 2007.

While Dawson was Terminal Manager, he was supervised by Joyner, Assistant Commissioner. Joyner was supervised by Michael Gorman ("Gorman"). Gorman's "budget title" was Deputy Commissioner of Facilities from July 2006 to May 2008. Arnold was the Chief Management Officer of Aviation from October 2005 through June 2006, and the Managing Deputy/Chief Administrative Officer of Aviation from June 2006 through September 2007. Arnold oversaw operations relating to air side, land side, facilities, safety, security, all business functions, and human resources. In December 2006, Arnold evaluated Dawson's performance with a total score of 2.74, which she characterized as "above average." Fernandez was Commissioner

of Aviation.

As Terminal Manager, Dawson was responsible for being the point of contact for maintenance, contractors, concessions, the airlines, and other City employees in the terminal as well as leading the custodial department. The list of Terminal Manager responsibilities comprising Dawson's duties and responsibilities includes: day-to-day operations of terminal building and concourses, including interaction with airlines, tenants, contractors, trades staff, and inspection; review reports for timeliness of completing work orders; report deficiencies and propose improvements to enhance appearance of facilities; coordinate repairs; perform daily terminal and restroom inspections; investigate and respond to inquiries from tenants regarding facility issues; perform routine inspections of the terminal and concourses with the building engineer to ensure proper operation of building systems, weather tightness of the building envelope, proper maintenance, and code compliance; assist in administrating Passenger Assistance Program; report accidents, vandalism, or property damage; assist in administrating service contracts for the terminal building and concourses; develop a tenant relations plan coordinating each tenant's priority issues, frequency of contact, needs, and preferences; handle consulting services of architects, engineers, and other professionals on technical issues; interact with tenant improvement, relocation, and

reconfiguration projects; attend weekly and monthly meetings as well as other meetings as requested; and review proposed project blueprints, attend pre-construction meetings, and review meetings as projects progress.  Performing daily terminal and restroom inspections involved looking at every bathroom to ensure that they were clean and usable for the general public.  Terminal 2 is the only terminal at O'Hare airport where the Terminal Manager supervises the custodial department.

On August 2, 2006, Fecketitsch was acting Terminal Manager of O'Hare's Terminal 1, which is about a five to ten minute walk from Dawson's office in Terminal 2.  Fecketitsch approached Dawson and "aggressively" asked him about why he sent Joyner an e-mail about Fecketitsch's terminal, and said that Dawson did not "know what the hell [he] was talking about."  Dawson asked Fecketitsch to wait until later to have the conversation, Fecketitsch refused, Dawson told Fecketitsch that Fecketitsch was harassing him, Fecketitsch followed Dawson to the Terminal Manager's office, Dawson told Fecketitsch he would not talk to him  because he was "very, very belligerent[,]" and Fecketitsch "said 'You're a stupid fucken nigger.'"

According to Joyner, if one of her direct reports believed he was the victim of discrimination, the first thing that employee is supposed to do is report it to his supervisor.  The next step is for the employee and Joyner to report it to the personnel

department.  Dawson "immediately" called Joyner.

Dawson also sent an e-mail to Robert May ("May"), Aviation human resources representative, notifying him of an incident with Fecketitsch.  The e-mail states that Dawson was approached by Fecketitsch, who asked him "in a very unprofessional manner '...Do you have a problem with me.'"  The e-mail does not refer to Fecketitsch using a racial slur.  The e-mail further states that Dawson walked back to his office, and Fecketitsch followed him and continued to harass him in Heracles Cannon's ("Cannon") presence.

Cannon, who is African-American, was an Assistant Terminal Manager supervised by Dawson.  Cannon testified that Dawson and Fecketitsch entered the office, Dawson told Fecketitsch that Fecketitsch was harassing him, and as Fecketitsch exited the office "he uttered the words stupid nigger."  Cannon called Joyner and reported what he heard.  Cannon remembered going to a meeting at personnel about the incident, and he wrote an incident report.

May, Stacy McNulty Ruffalo ("Ruffalo"), a former Aviation human resources employee, and Joyner spoke to Dawson about the incident.  At that meeting, Dawson submitted an incident report claiming that Fecketitsch referred to him as a "stupid fucking nigger" and listing Cannon as a witness.  May and Ruffalo advised Joyner "to make sure the two do not work together until we complete our investigation."  Joyner informed May that making sure that Dawson and Fecketitsch did not work together would not be an issue

because they were in separate terminals.  Dawson did not ask that
Fecketitsch be separated from him.

Joyner testified that, within a day or two of talking to
Gorman about the incident, Gorman told her to move Dawson to the
third shift even though Joyner told him that there was not enough
staff available to do so.  Dawson testified that, on August 4,
2006, Joyner told him that he would be moving to the third shift.
Ultimately, the transfer was rescinded.

According to Dawson, after August 2, 2006, Fecketitsch
constantly entered Terminal 2 and made Dawson aware of his
presence.  Dawson testified that Fecketitsch harassed Dawson with
his presence and body language.  On one occasion, Dawson was
standing in front of his office, and Fecketitsch "stopped, got on
his telephone, stood there and watched [Dawson] after he got off of
his phone . . . . "  Fecketitsch stared at Dawson while talking on
the phone.  When Fecketitsch hung up, he stared at Dawson, walked
by him, and walked away.  They did not speak to each other.

Express City policy, as codified in the Municipal Code of
Chicago §§ 2-160-010, 2-160-030, and 2-160-100, prohibits
discrimination, harassment, or retaliation based on race or color.
In accordance with City policy, employee complaints of
discrimination are investigated and recorded by the Department of
Human Resources ("DHR"), Equal Employment Office ("EEO").

Dawson was advised that a written form needed to be completed

and forwarded to Keller. Keller, who is African-American, was DHR EEO Specialist from August 1999 through September 2006. Keller's title changed to Project Coordinator in October 2006, but his responsibilities remained the same. Keller made written recommendations to the EEO officer or liaison, the basis of which depended on the case but included interviews and maybe reviewing certain documents.

Keller investigated Dawson's complaint and issued findings and recommendations for discipline to Aviation. Dawson never met with Keller regarding the incident, was never notified that there was an EEO investigation of this incident, and did not learn about a letter making findings regarding the investigation of this incident until after this lawsuit was filed. Keller did not have the authority to hire employees or to approve hiring decisions, nor was he involved with the posting of job positions. Keller attests that he does not have any supervisory responsibility, and he was not a decisionmaker regarding any of the employment decisions that affected Dawson or any other City employee.

On August 4, 2006, Keller received a call from Ruffalo informing him of an incident on August 2 involving Dawson and another employee that Ruffalo thought "was a violence in the workplace incident." On August 7, 2006, Dawson sent Keller an e-mail stating that on August 2, 2006 he made Joyner, May, and Ruffalo aware of "the horrible racial incident" he experienced with

Fecketitsch.  Dawson e-mailed Keller because he had sent an e-mail to Ruffalo, May, and Joyner asking what was going on with the investigation and had not heard back.  Dawson's e-mail also states that, on August 4, 2006, Joyner told him that he would be working the third shift permanently, and that he felt that the "new assignment is clearly retaliation by [senior] DOA Management." Keller's response to Dawson's e-mail states that Keller has "no knowledge of [Dawson's] complaint" and will contact Joyner and May "to obtain information and a copy of [his] complaint."  Keller's handwritten notes on the e-mail state "don't start with Mr. Dawson - timing is not good - move is suspect."  On August 7, 2006, Dawson submitted an EEO complaint form to Aviation that was forwarded to DHR for investigation.  On August 10, 2006, Keller received from Ruffalo the EEO complaint, the notes from the meetings, and Cannon's EEO witness statement.

After the incident with Fecketitsch, Dawson complained to Keller via e-mail about adverse actions he believed were taken in retaliation for complaining about discrimination.  When asked whether Keller spoke to May again after speaking to May about the August 7, 2006 e-mail, Keller testified that he would have spoken to him "upon receipt of any of the E-mails."

On August 15, 2006, Dawson e-mailed Keller, stating that Joyner entered the office where he, Cannon, and William Cruse were sitting and "clasps her hands several times stating '..chop, chop,

what are we doing here..'", which he felt was "demeaning, disrespectful, and had a racial overtone as all three employees in the office were African American Males."  The e-mail also stated that when Dawson told Joyner that he "had not taken a lunch today[,]" she "stated '...Can't you take your lunch tomorrow...'" Regarding Dawson's e-mail, May stated in an e-mail dated August 15, 2006 that Joyner "feels very uncomfortable with direct supervision of theses [sic] two individuals" and it was May's "recommendation that we separate this group until we receive the recommendation from EAP."  In an e-mail to May on August 16, 2006, Gorman stated that, "This might put a temporary fix to the issue, but I am not in the position of sending my problems to another department."

When Arnold received a copy of the charges that had been filed presumably with the Illinois Department of Human Rights ("IDHR") although the record is not clear on this point, she checked the date and signature.[2]  Arnold then called Ruffalo to find out if Dawson had been at work that day, and was told that he was not and that he had used sick time.  Arnold next contacted May and told him that there was a concern about a misuse of sick time, and that Dawson needed to fill out the appropriate certification forms. According to Arnold, she had Dawson fill out the form because sick time is supposed to be used for being sick or attending medical

_____

[2]Arnold was not aware that these IDHR charges were separate from the charges sent to Keller to investigate, but she may have later learned that they came from an outside agency.

appointments. Arnold asked May to contact the law department to determine what the options were for disciplining Dawson. Based on May's conversation with the law department, it was Arnold's understanding that they could give Dawson a written warning or suspension. Arnold and May agreed that a five day suspension was appropriate because "there was a misuse of sick time as well as a falsification[.]"

On August 25, 2006, Dawson sent Keller an e-mail, stating that he was "being told to fill out A Sick Leave certification Form even though [he has] not called in sick 2 or 3 consecutive days." One of the questions Keller had about the request to have Dawson fill out a sick leave form was whether the process was being used to single him out. Keller was satisfied with the responses he got from management. Dawson attests that he forwarded an "e-mail string" to Fernandez on August 25, 2006, the top message in which states that Joyner "threatened" to take action against him unless he filled out the sick leave certification form. Prior to August 24, 2006, there were no instances when Joyner considered Dawson to have abused the City's attendance policy, and she did not remember having any problem with Dawson having excessive absences. Neither did Arnold know of any disciplinary actions against Dawson regarding attendance prior to August 24, 2006.

In or around September 2006, Dawson's responsibilities changed from terminal management to being responsible for the Terminal 2

11

custodial staff.  Until September 2006, Arnold was not aware of any performance issues involving Dawson as Terminal Manager, and she did not recall receiving any complaints.  Arnold did not know why the change was made, and she did not recall asking anyone or conducting any investigation.  Keller testified that, upon receiving a September 14, 2006 e-mail from Dawson regarding Dawson's complaint of a demotion, Keller contacted the department.  Keller testified that, after having a conversation with May regarding the September 14, 2006 e-mail, Keller did not take any action because, once he learns that someone filed a complaint with the IDHR or EEOC or has legal representation, his position is to "defer" so as not to "be cited for interference in the investigation."

On October 17, 2006, after investigating the allegations in Dawson's EEO complaint, Keller issued findings that the allegations were sustained.  Keller's recommendations included providing Fecketitsch with disciplinary corrective action ranging from documented oral counseling to written reprimand, but not suspension.  Aviation disciplined Fecketitsch in accordance with Keller's recommendations.  Keller never instructed anyone to have Dawson fill out separate complaint forms alleging retaliation.  Keller did not do so based on his communications with May, after which he felt that there was not a basis for retaliation.

Dawson complained to May, Joyner, and Arnold about another

incident on or about January 5, 2007 between Fecketitsch and a custodian that occurred in Terminal 2. Dawson did not state in his e-mail that racial comments were made, but when Dawson spoke to May on the phone the day before Dawson was transferred, around January 8 or 9, 2007, Dawson told May that he believed the incident "was racially motivated." The custodian never verified "the racial portion of it[,]" but Dawson "was certain that this employee felt threatened by [] Fecketitsch."

When Arnold learned that someone else was taking the terminal management position on or around January 10, 2007, she contacted Fernandez and "told her that the acting position that [Dawson] had been in was being filled." Arnold met with Dawson and gave him the option to resign or accept a position at the warehouse, effective immediately. Arnold told him he was offered the other position because he was not a proper fit for the Terminal Manager position.

Arnold testified that she, Fernandez, Valerie Walker ("Walker"), and Kevin Faul ("Faul"), Manager of Warehouse Operations, made the decision to reassign Dawson to the warehouse. Gorman testified that, when Arnold told him that Dawson was being removed from the acting Terminal Manager position, Gorman told Arnold that he could still use Dawson because there was a vacant position that Dawson could fill. Gorman testified that Arnold told him that Dawson could not be placed in that position. In Faul's experience, no one involved in running the terminals had been

reassigned to work in the warehouse.  Faul testified that Arnold
told him to use Dawson for certain projects and in any way to
assist him in the warehouse.  The warehouse position did not have
any people reporting to Dawson.

Arnold testified that she told Dawson "he was being reassigned
to the warehouse to manage special projects under Kevin Faul."  By
special projects, Arnold meant records retention, online auction,
and inventory management.  Dawson testified that Arnold told him
that he would be reporting to Faul who would inform him of
everything.  Dawson did not ask Arnold about his job duties.
Dawson did not know exactly what his duties would be until Faul
explained them.  Dawson believes he was given the choice to resign
or go to the warehouse in retaliation.  On January 19, 2007,
Dawson's counsel sent a letter to the City's Deputy Commissioner
for Workforce Development, copying Arnold, advising him of Dawson's
demotion to the warehouse as well as the alleged racial
discrimination and other retaliatory misconduct.[3]

From January 2007 to October 2007, Dawson retained his
budgeted title of Fiscal Administrator, exempt employee status,
salary, and benefits during his assignment to the warehouse.

---

[3]Defendants object to the letter as unsigned and improperly
autheticated by plaintiff's counsel.  Defendants also object that
the letter was not produced during discovery.  The letter purports
to copy Arnold, plaintiff's counsel has included a signed certified
mail receipt addressed to Arnold, and defendants have not indicated
that she did not receive it.

Dawson was informed that he "would be trained on all functionalities at the warehouse, computer work, removing items from the shelves, office supplies, moving boxes on and off of trucks to bring office supplies to the City of Chicago Employees." Dawson would also be doing "inventory checking," which "meant climbing up into warehouse bays, cleaning things out, sweeping up and in totality receiving and shipping items." Dawson was told he would be doing a records management project and another project. Dawson did not object to those duties to Faul or Arnold. Dawson complained to Faul that he did not have computer access from January 2007 to April 2007.

Faul testified that the special projects that Arnold wanted Dawson to be involved in were an online auction project to sell or salvage overstock furniture and a records management project to send boxes of records off-site for destruction. Faul would not have expected these projects to occupy Dawson full-time, and "some days" it was all day but "[o]n average" it was not. When Dawson was not working on those two projects, Faul tried to train him in every aspect of the warehouse operation. Faul testified that Dawson did physical work, including opening boxes and removing items, filling work orders for office supplies, removing industrial parts as part of a shelf relocation project, and sweeping the warehouse floors. Faul also testified that it was not unusual for anybody in the warehouse to sweep floors. When asked if anyone

told Dawson to sweep floors, Faul testified that after a monthly safety meeting all warehouse staff would pick up paper or items in the walkways and everyone would "pitch in now and then to help clean up areas if needed."

Faul testified that Arnold periodically asked him for reports on Dawson. Arnold did not ask Faul about anybody else at the warehouse. Dawson testified that Faul told him that Arnold instructed Faul to report on Dawson, and that Faul felt it was "pretty strange" because Arnold had never asked him to give reports on anyone else at the warehouse. Dawson testified that, in January 2007, he began providing daily activity reports to Faul because Faul told him that Arnold wanted reports on him, which Dawson believed was "a way to single [him] out and to keep tabs on [him] . . . . "

Dawson resigned in October 2007, nine months after he was reassigned to the warehouse. The conditions were substantially the same from the time he went to the warehouse until the time he quit. Dawson stayed until October 2007 because "it's [his] personality not to – to stick it in there, to hang in there as long as [he] can, and [he] did that." When asked if there was any specific occurrence that caused him to quit, Dawson testified that "[e]very day [he] had to either sweep or mop or do manual labor . . . . " Dawson admitted that he did so without complaining, which would have been insubordination. Dawson did not notify Keller by e-mail

about any of the conditions at the warehouse.

Prior to August 2, 2006, Dawson did not have any racial incidents directed towards him by Fecketitsch. After August 2, 2006, Dawson never heard Fecketitsch make any racially derogatory comment or slur. After Dawson's initial complaint on August 2, 2006, no one at the City directed any racial slurs or derogatory comments towards him.

Dawson is not aware of other non-African-American employees who complained of racial discrimination and retaliation, but were treated more favorably. When asked to identify other African-Americans who complained of racial discrimination and were treated similarly to him, Dawson named Cannon. Dawson does not have personal knowledge of how that complaint was handled or whether it was investigated. Dawson did not talk to Cannon about the outcome of his complaints. Cannon testified that, after he met with Joyner, May, and Ruffalo, his and Joyner's "relationship started to deteriorate." Cannon further testified that he is not saying that Joyner treated him differently after he gave a statement supporting Dawson, but that, "[a]fter August 2nd, things got kind of hairy there." Cannon also testified that he did not experience racial incidents while working for Aviation other than the comment by Fecketitsch. When asked to identify other instances of misconduct other than against himself and Cannon, Dawson testified that he knows of a race discrimination lawsuit involving the City and the

Aviation motor truck drivers and a custodian alleged that the person who was the head of the custodians "was involved in some sort of racial harassment[.]"

In Dawson's interrogatory answers, he identifies Fernandez, Arnold, Keller, Fecketitsch, and Joyner as well as, on "information and belief," Gorman and John Cisco ("Cisco") as policymakers responsible for causing his constitutional injuries. Arnold informed Fernandez via e-mail on August 7, 2006 of "an incident involving two employees in a public area of the airport, and that there was going to be a filing of EEOC." The e-mail stated that no action was required of Fernandez at that time. Additionally, Dawson sent two e-mails to Fernandez complaining of improper actions at Aviation, including the threatened third shift demotion, the five day suspension, the demotion to custodial supervisor, and the warehouse reassignment. Fernandez attempts to review and assign all e-mails for action. Defendants assert that Fernandez did not become involved in personnel matters, but the record on this point is not entirely clear. Fernandez would be involved if "notified by the corporation counsel of a personnel action that had been investigated . . . , by the commissioner for the department of human resources on a personnel matter . . . [,] or by the inspector general on matters of personnel" that required any action on her part. Fernandez was responsible for hiring direct reports and for approving the hire recommendation for employees at the terminal

level.

Dawson applied online through DHR for the position of Airport Facilities Manager in Aviation, and he was interviewed in or around December 2006. In addition to two interviewers, a court-ordered Shakman monitor was present during Dawson's interview. In December 2006, Dawson was informed that he was not selected for the position. Dawson has no evidence or knowledge that the interviewers were aware of his complaints of racial discrimination. Arnold was not involved in the interview process.

Dawson alleges that a series of adverse actions, including the rescinded transfer to the third shift, the five-day suspension, the demotion to custodial supervisor, the removal from his position as acting Terminal Manager, and the reassignment to the warehouse, were so intolerable that he felt compelled to resign. Dawson also claims that he "was moved from a managerial position with direct reports to a clerical warehouse position where [he] was demeaned daily[;]" "[n]o other white Terminal Managers with a Notre Dame degree were moved to a warehouse and made to work in a warehouse sweeping, mopping and doing manual labor work[;]" he was told daily that he was the highest paid clerk, which was "embarrassing[;]" and he swept and did manual labor. Dawson did not tell anyone that he was not happy with this situation. Dawson testified that he went to the emergency room twice, in March 2007 and August 2007, due to headaches and chest pain. He was told not to work for four days

the first time and for two days the second time, and that he needed
to rest.  Dawson attests that, between August 3, 2006 and October
5, 2007, he applied for more than fifty positions with the City.
He received only two interviews, one of which was for the Terminal
Manager position he previously held.

II.

Summary judgment is appropriate where the record shows that
there is no genuine issue of material fact and that the moving
party is entitled to judgment as a matter of law. *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986)).  A genuine issue for trial
exists "if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party." *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986).  The movant initially bears the
burden of "identifying those portions of 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any,' which it believes
demonstrate the absence of a genuine issue of material fact."
*Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the
non-movant "may not rest upon the mere allegations or denials of
the adverse party's pleading," but rather "must set forth specific
facts showing that there is a genuine issue for trial."  FED. R.
CIV. P. 56(e)(2).  I must construe all facts in the light most
favorable to the non-movant and draw all justifiable inferences in
favor of that party. *See Anderson*, 477 U.S. at 255.

20

III.

A. Hostile Work Environment Claims

Counts I, IV, and V allege that Dawson was subjected to a racially hostile work environment in violation of Title VII (count I) and §§ 1981 and 1983 (counts IV and V, respectively). (*See* Second Am. Compl. ¶¶ 20 (count I), 19 (count IV), 31 (count V).) The complaint also alleges that Dawson was subjected to adverse employment actions because of his race as well as "a hostile work environment of retaliation[.]" (*See id.* ¶¶ 19 (count I), 20 (count IV).) Defendants' motion for summary judgment is limited to the hostile work environment claims based on racial harassment.[4] (*See* Defs.' Mem. at 2-5.)

Under Title VII, it is unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . . " 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States

---

[4]Defendants' motion does not encompass any retaliatory harassment claims. *See Hobbs v. City of Chicago*, --- F.3d ----, 2009 WL 2151308, at *7 (7th Cir. July 21, 2009) (explaining that retaliatory harassment can rise to level of hostile work environment if severe enough to cause significant change in plaintiff's employment status); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808-11 (7th Cir. 2001) (explaining that hostile environment motivated purely by plaintiff filing complaint of sexual harassment was form of retaliation rather than sexual harassment).

shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). Section 1981 claims are evaluated "under the same rubric as Title VII claims[.]" *Herron v. DaimlerChrysler Corp.,* 388 F.3d 293, 299 (7th Cir.2004) (citing *Williams v. Waste Mgmt. of Illinois Inc.,* 361 F.3d 1021, 1028 (7th Cir.2004)). The elements of a § 1983 hostile work environment claim differ,[5] but this § 1983 claim nevertheless can be resolved along with these Title VII and § 1981 claims.

Dawson may establish a violation of either statute by proving that he was subjected to a hostile work environment. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). Therefore, I need not address the Title VII and § 1981 claims separately. *Herron,* 388 F.3d at 299. To establish a hostile work

_____

[5] "[B]ecause the Constitution prohibits intentional discrimination by state actors, § 1983 relief is available to a plaintiff claiming a hostile work environment only when []he can demonstrate that the defendant acted with discriminatory intent." *Huff v. Sheahan*, 493 F.3d 893, 902 (7th Cir. 2007) (explaining that difference in elements of two types of sexual harassment claims ordinarily would prevent viewing jury verdict for defendant on § 1983 claim as dispositive of Title VII claim). "The same is not true of a Title VII plaintiff claiming hostile work environment harassment." *Id.*

environment claim, the plaintiff must show that (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004).

To evaluate severity and pervasiveness, I examine all circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with work performance. *Id.* To satisfy the severe or pervasive prong, the plaintiff must show that the work environment was both subjectively and objectively offensive. *Id.* In other words, the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact perceived to be hostile or abusive. *Id.*

The basis for employer liability is evaluated differently depending on whether the alleged harassment was perpetrated by a supervisor or a coworker. *Williams,* 361 F.3d at 1029. Employers are strictly liable for harassment by supervisors, subject to an affirmative defense when the harassment does not result in a tangible employment action. *Id.* When the plaintiff claims harassment by coworkers, he must show that his employer was negligent either in discovering or remedying the harassment. *Id.*

Thus, an employer can avoid liability if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. *Id.*

With regard to whether the harassment was based on race, defendants argue that Dawson "has little, if any, evidence" that the complained of events related to his race. Defendants argue that the only evidence related to Dawson's race is the slur Fecketitsch made on August 2, 2006. Before that, Dawson did not have any racial incidents directed towards him by Fecketitsch, and after that Dawson did not hear Fecketitsch or anyone at the City make any racially derogatory comment or slur. Defendants also argue that Fecketitsch staring at Dawson does not "convert an isolated statement into a hostile work environment."

Dawson responds that Fecketitsch's remark constitutes *per se* race discrimination. Again, defendants do not contend that Fecketitsch's remark was not based on race. (*See* Defs.' Mem. at 3; Defs.' Reply at 4.) Dawson additionally points to comments by Joyner, which he characterizes as "racially derogatory statements" and "racial epithets." Specifically, Dawson cites his August 15, 2006 e-mail to Keller stating that Joyner said "'..chop, chop, what are we doing here..'" which Dawson felt was "demeaning, disrespectful, and had a racial overtone" because the employees were African-American, and that Joyner said" '...Can't you take your lunch tomorrow...'" when Dawson told her he had not eaten

24

lunch that day.  Dawson does not explain, however, how these comments pertain to race nor how they have any racial connotations. Moreover, Dawson admits that, after August 2, 2006, no one at the City directed any racial slurs or derogatory comments towards him.

Dawson also responds that, after August 2, 2006, Fecketitsch continued to engage in "openly hostile and intimidating gestures" directed toward Dawson and in Dawson's presence by constantly entering Terminal 2 and making Dawson aware of his presence. Dawson argues that Fecketitsch harassed him with his presence and body language.  Fecketitsch stared at Dawson while talking on the phone and when hanging up the phone, and then Fecketitsch walked by Dawson without speaking to him.  Dawson does not connect these actions to his race, although they were engaged in by a coworker who had directed a racial slur at him.

With regard to whether the harassment was severe or pervasive so as to alter the conditions of the work environment by creating a hostile or abusive situation, defendants argue that Dawson has no evidence that any other allegedly adverse events related to his race.  Defendants argue that Dawson's claims that being transferred to the third shift, given a five day suspension, demoted to Custodial Supervisor, and reassigned to the warehouse created a racially hostile work environment are based on speculation. Defendants further argue that, even if Dawson had evidence that these events related to his race, the combination of these events

with the single statement by Fecketitsch does not rise to the level of workplace trauma that constitutes a hostile work environment.

Dawson responds that he has shown that his work environment was both objectively and subjectively hostile. Dawson cites his complaint to Keller on August 7, 2006 about the incident with Fecketitsch, the charge of discrimination "filed on August 14, 2006 about his transfer and Fecketitsch's comment," the five-day suspension, Joyner's comments, the demotion to Custodial Supervisor, and the reassignment to the warehouse. Dawson cites no record evidence connecting these events to his race. He merely states that "[t]hroughout this period" Fecketitsch made hostile and intimidating gestures, and refers to Fecketitsch's comment and Joyner's comments.

The cases on which Dawson relies are distinguishable. In *Rodgers v. Western-Southern Life Ins. Co.*, the court found no error in the conclusion that the supervisor's "use of the word 'nigger' contributed to a hostile work environment[,]" explaining that "[p]erhaps no single act can more quickly 'alter the conditions of employment and create and abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." 12 F.3d 668, 675 (7th Cir. 1993) (internal quotations omitted). The court further stated that "a supervisor's use of the term impacts the work environment far more severely than use by co-equals." *Id.* Also, the supervisor in

*Rodgers* had made a number of other racist statements. *See id.* at
675-76. In *King v. Chicago*, the court concluded that the plaintiff
"easily met the objective component of the hostile work environment
inquiry" as he was "repeatedly berated with unambiguously racial
epithets such as 'coon,' 'sambo,' and 'forty acres and a mule.'"
No. 04 C 7796, 2007 WL 4365325, at *4 (N.D. Ill. Dec. 11, 2007).
The court concluded that a "pattern of derogatory remarks that
separate African-Americans from every employee outside the
protected class is objectively hostile." *Id.* (citations omitted).

Examining all of the circumstances here, there was one
incident of discriminatory conduct in the form of an offensive
utterance by a coworker as well as the coworker's subsequent
presence and body language. Although Dawson asserts that
Fecketitsch constantly entered Terminal 2 and made Dawson aware of
his presence, the only specific example in the record is an
instance when Fecketitsch stared at Dawson and then walked by him
without saying anything.[6] The foregoing conduct does not allow a
reasonable inference that Dawson suffered an objectively hostile
work environment.

Therefore, Dawson has not shown that the harassment was severe
or pervasive. As such, I need not address whether there is a basis

---

[6]With regard to the January 5, 2007 incident between
Fecketitsch and another employee about which Dawson complained to
May, Joyner, and Arnold, although Dawson told May that he believed
the incident was racially motivated, the other employee never
confirmed that.

for employer liability.  Defendants' motion for summary judgment on the Title VII, § 1981, and § 1983 hostile work environment claims based on racial harassment in counts I, IV, and V is granted.

## B. Constructive Discharge Claim

Count III alleges that, on October 5, 2007, Dawson was constructively discharged in violation of Title VII "in retaliation" for making "complaints and charges of race discrimination and retaliation."  (Second Am. Comp. ¶ 19 (count III).)  Unlike the foregoing hostile work environment claims, the constructive discharge claim relates to the alleged retaliatory conduct, including the unrealized shift transfer, the five day suspension, the demotion to Custodial Supervisor, and the reassignment to the warehouse.  (*See id.* ¶¶ 20-22 (count III).)

Constructive discharge occurs when a plaintiff shows that he was forced to resign because his working conditions, from the standpoint of a reasonable employee, had become unbearable. *Fischer v. Avande, Inc.* 519 F.3d 393, 408-09 (7th Cir. 2008) (quoting *Equal Employment Opportunity Comm'n v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)).  Constructive discharge can take two different forms.  *Id.* at 409.  Under the first approach, the plaintiff must demonstrate a discriminatory work environment even more egregious than the high standard for a hostile work environment.  *Id.* Under the second approach, when an employer acts in a manner that communicates to a reasonable

28

employee that he will be terminated, and then the plaintiff resigns, the employer's conduct may amount to a constructive discharge. *Id.* With the second approach, a constructive discharge also occurs if, based on the employer's actions, the handwriting was on the wall and the axe was about to fall. *Id.* The parties do not acknowledge these distinct approaches.

Defendants only argue that Dawson must demonstrate a discriminatory work environment even more egregious than the high standard for a hostile work environment. (Defs.' Mem. at 6-7.) Defendants also rely on authorities addressing constructive discharge in the context of harassment based on a protected characteristic - as opposed to based on retaliation. (*Id.*) Defendants have not cited any authority showing that diminished job duties cannot constitute intolerable working conditions such that a reasonable person would have felt compelled to resign.

Defendants focus on Dawson's reassignment to the warehouse in isolation from the preceding attempted transfer, suspension, and demotion. Specifically, defendants argue that Dawson neither asked questions nor complained when Arnold informed him he was being reassigned to the warehouse; never complained to Faul about his duties or working conditions other than about the computer access issue; and did not lose salary, title, or benefits. Defendants further argue that, while Dawson thought his duties were not commensurate with his experience, he made no such complaints,

instead working in the warehouse for more than nine months with no change in his working conditions. The crux of Dawson's response is that he was dissuaded from complaining about the reassignment to and conditions in the warehouse based on the City's actions in response to his prior complaints. (*See* Pl.'s Resp. at 9.)

Dawson was reassigned to and continued to work in a position involving no change in title, status, salary, and benefits, but entailing a diminution in responsibilities and requiring the performance of menial tasks that he thought were beneath his experience and education. On January 19, 2007, Dawson's counsel sent a letter to the City's Deputy Commissioner for Workforce Development, copying Arnold, advising him of Dawson's demotion to the warehouse as well as the alleged racial discrimination and other retaliatory misconduct. Dawson remained at the warehouse until October 2007, at which time the conditions were substantially as when he was transferred there. What caused Dawson to quit was having to do manual labor every day, although he did not complain. From August 3, 2006 to October 5, 2007, Dawson applied for more than fifty positions with the City. He received only two interviews, one of which was for the Terminal Manager position.

A question of material fact exists as to whether a reasonable employee would find the conditions Dawson experienced so unbearable that he was forced to resign. *Cf. Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004) (explaining that

employment discrimination suit is not precluded when professional employee is relegated to menial tasks and employer makes it clear that no better treatment can be hoped for, but finding plaintiff was not constructively discharged where she was not turned out of her office nor given tasks demeaning to her education and accomplishments); *Fischer*, 519 F.3d at 411 (explaining that plaintiff could perhaps defeat summary judgment by showing that, despite seemingly maintaining compensation, position, and responsibilities, transfer set her on "dead-end path towards termination[,]" but finding that by resigning a few weeks after transfer she did not allow ample time to determine dead-end nature of new position). Defendants' motion for summary judgment on count III is denied.

## C. *Monell*[7] Liability

Count IV alleges that "the race discrimination and harassment, retaliatory adverse employment actions, and the approving and condoning of these actions by the office of the Commissioner of the Department of Aviation and the City's Department of Human Resources, was done by the Defendants while acting under color of state law and in their official capacity" in violation of § 1981, the First and Fourteenth Amendments, and § 1983. (Second Am. Compl. ¶ 23 (count IV).) Count IV alleges that the City

---

[7]*Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

"empowered" Fecketitsch, Joyner, Arnold, Fernandez, and Keller to establish a hostile work environment of race discrimination, harassment, and retaliation by "placing them in a position to establish a pattern and practice" of race discrimination and retaliation against City employees including Dawson and by "failing to monitor their activities[.]" (*Id.* ¶¶ 19-20 (count IV).) Count IV also alleges that the complained of actions were "in retaliation for the exercise and/or the attempted exercise of plaintiff's right to speech and press, in violation of the First Amendment, and/or because of plaintiff's race in violation of due process and equal protection, in violation of the Fourteenth Amendment. (*Id.* ¶ 24 (count IV).) Count IV also alleges that the City failed to implement any policy to prevent or eliminate race discrimination and harassment as well as retaliation. (*Id.* ¶ 25.) Count IV further alleges that the failure to take immediate corrective action to prevent race discrimination and harassment as well as retaliation "were either carried out by sufficiently high ranking" City officials "who either possessed or had been delegated final policymaking authority" regarding personnel issues within Aviation, including Joyner, Arnold, Fernandez, and Keller. (*Id.* ¶ 26.) Count IV further alleges that the failure to take immediate corrective action to prevent race discrimination and harassment as well as the retaliation were City policy. (*Id.* ¶ 27.)

For a municipality to be liable under § 1981, a plaintiff must

show that its "official policy or custom was discriminatory." *Smith v. Chicago Sch. Reform Bd. of Trs.,* 165 F.3d 1142, 1148 (7th Cir. 1999) (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 736-37 (1989) for "applying to suits under § 1981 the principles devised for § 1983 litigation by *Monell"*); *see Johnson v. Joliet Junior Coll.,* Nos. 06 CV 5086, 06 C 2135, 2009 WL 674357, at * 3 (N.D. Ill. Mar. 13, 2009) (Andersen, J.). The same is true of § 1983 liability. *See Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (explaining that municipal entities cannot be vicariously liable for employees' acts under § 1983 on *respondeat superior* theory). To prove the existence of a discriminatory policy or custom, Dawson must show that: (1) the City has an express policy that caused a constitutional deprivation; (2) the City has a widespread practice of discrimination that is so permanent and well-settled that it constitutes a custom or usage; or (3) his injury was caused by a person with final policymaking authority. *Phelan*, 463 F.3d at 789 (citation omitted); *Johnson*, 2009 WL 674357, at * 3 (citing *Monell,* 436 U.S. at 690-91). Only the second and third theories are at issue here.

I first address the second theory, whether the City has a widespread practice of discrimination that is so permanent and well-settled that it constitutes a custom or usage. Essentially, Dawson argues that Keller's, Fernandez's, Arnold's, and Joyner's knowledge of the retaliation against him demonstrates the existence

of a widespread practice of ignoring such complaints.  *See Phelan*,
463 F.3d at 789-90 (addressing plaintiff's argument that evidence
of knowledge and condoning of sexual harassment on part of various
supervisory officials demonstrates existence of widespread practice
constituting custom or usage).  Generally, a plaintiff is not
foreclosed from pursuing § 1983 claims by demonstrating that
repeated actions directed at him evince the existence of a policy.
*Id.*  "'[W]hat is needed is evidence that there is a true municipal
policy at issue, not a random event.'" *Id.* at 790 (quoting *Calhoun
v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).  The word
"widespread" must be taken seriously.  *Id.* at 790.  It is not
enough to show that policymakers could or should have been aware of
the unlawful activity because it occurred more than once.  *Id.*
Rather, "[t]he plaintiff must introduce evidence demonstrating that
the unlawful practice was so pervasive that acquiescence on the
part of policymakers was apparent and amounted to a policy
decision." *Id.*

The City argues that Dawson cannot show a widespread practice
of discrimination against African-Americans or retaliation against
employees who complain about racial discrimination because Dawson
relies only on his own constitutional injuries as he has no
personal knowledge about the claims by Cannon and other litigation.
Dawson responds that his theory is that there is a "custom or
practice of non-response to retaliation directed at [him]."  Dawson

argues that "the likelihood remains that the City followed a practice of non-response to complaints of retaliation" based on repeatedly ignoring his complaints. Specifically, Dawson argues that Keller, Fernandez, Arnold, and Joyner were "aware" of his "complaints" based on the following evidence: Keller investigated his complaint and issued findings and recommendations for discipline to Aviation; Dawson immediately contacted Joyner about the incident with Fecketitsch; on August 7, 2006, Dawson advised Keller that he had informed Joyner, May, and Ruffalo of the incident with Fecketitsch and that Joyner told him that he would be reassigned to the third shift which he felt was retaliatory; Keller's handwritten notes stated "don't start with Mr. Dawson - timing is not good - move is suspect[;]" on August 7, 2006, Arnold informed Fernandez via e-mail of "an incident involving two employees" and that there would be an EEOC filing, and told her that no action was required; on August 15, 2006, Dawson informed Keller of Joyner's comments; Arnold received a copy of the charges Dawson filed; on August 25, 2006, Dawson e-mailed Keller and Fernandez about having to fill out the sick leave certification form; on September 14, 2006 Dawson e-mailed Keller about Joyner telling him that he would not have acting Terminal Manager responsibilities and would only focus on the custodial division; and, on October 2, 2006, Dawson e-mailed Keller about being demoted.

Similarly to *Phelan*, although Dawson has presented evidence of multiple instances of retaliation against him, he has not woven these separate incidents together into a cognizable policy. *See id.* These incidents are insufficient to create a genuine issue of material fact as to whether the practice of ignoring retaliation was permanent and well-settled. *See id.*

I next address the third theory, whether Dawson's injury was caused by a person with final policymaking authority. The fact that an official - even a policymaking official - has discretion in exercising particular functions does not alone create municipal liability based on an exercise of that discretion. *Valentino v. Vill. of S. Chicago Heights*, --- F.3d ----, 2009 WL 2253406, at *7 (7th Cir. July 30, 2009) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986)). Whether a person has policymaking authority is a question of state law. *Id.* (citations omitted). The question is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in the particular area or on a particular issue. *Id.* Thus, the question is whether the alleged policymakers here are policymakers on personnel decisions. *Id.* (citation omitted). Officials with final decisionmaking authority are deemed to be policymakers for *Monell* purposes, and I look to state law to determine the scope of such authority. *Id.* (citations omitted).

To help determine whether an official is a final

decisionmaker, I inquire as to whether he is constrained by the policies of other officials or legislative bodies; his decision on the issue in question is subject to meaningful review; and the policy decision purportedly made by him is within the realm of his grant of authority. *Id.* at *8 (citation omitted). It is also helpful to examine not only positive law, including ordinances, rules, and regulations, but also the relevant customs and practices having the force of law. *Id.* (citations omitted). Just because an official makes personnel decisions does not necessarily make him the final decisionmaker on such matters such that he is a policymaker in that area. *Id.* Mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority; rather, there must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire. *Id.* (citations omitted).

The City argues that Dawson cannot show that a person with final policymaking authority caused his injury, and that the City Council is the official policymaker for the City. Dawson responds that he need not show that his constitutional injuries were ratified by the City Council. Dawson contends that Fernandez, Arnold, Joyner, and Gorman are final policymakers because they "had authority to discipline plaintiff and alter his work assignments, and did so on the heels of plaintiff's complaints." (*See* Pl.'s Resp. at 13.) Taking the facts in the light most favorable to

Dawson, Joyner and Gorman were involved in the decision to transfer him to the third shift, which was not carried out; Arnold informed Fernandez of an incident involving two employees at the airport, and told her nothing was required of her; Gorman responded to May's recommendation to separate unspecified individuals based on Joyner's discomfort by saying that he is not "in the position of sending [his] problems to another department[;]" Arnold was the Managing Deputy/Chief Administrative Officer of Aviation from June 2006 through September 2007; and Arnold had Dawson complete a sick leave certification form. Dawson has not shown, however, that the foregoing facts support a reasonable inference that Fernandez, Arnold, Joyner, and Gorman have final decisionmaking authority so as to be deemed to be policymakers.

Dawson has not established *Monell* liability based on a widespread practice or an injury caused by a person with final policymaking authority. Therefore, I grant summary judgment for the City on count IV.

### D. Individual Liability

Count V alleges individual liability under §§ 1981 and 1983 as follows. Count V alleges that the racial harassment and constitutional deprivation on August 2, 2006 were "directly caused and intended" by Fecketitsch. (Second Am. Compl. ¶ 31.) Count V also alleges that the retaliation was "intentional and performed at the direction of and/or with the complete knowledge and

acquiescence of" Joyner and Arnold, and Fernandez and Keller "approved, condoned and/or turned a blind eye" to Joyner's and Arnold's retaliatory actions. (*Id.* ¶ 32.)

For an individual defendant to be liable under § 1983, he must have caused or participated in a constitutional deprivation. *Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). For a supervisor to be liable, the conduct causing the constitutional deprivation must have occurred at his direction or with his knowledge or consent. *Id.* (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). "That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.*

Keller and Fernandez argue that they are not individually liable because Dawson cannot establish that they participated in any adverse decisions affecting his employment. Keller and Fernandez further argue that their positions alone do not subject them to liability. Dawson responds that Keller's and Fernandez's "reckless disregard of [his] rights to be free from retaliation violated clearly established constitutional norms and Illinois law[,]" and his "numerous e-mails to Keller and Fernandez specifically complaining about discrimination and rapid-fire retaliation sufficiently establishes Keller's liability under § 1983."

Dawson's theory of liability as to Keller and Fernandez is premised on their alleged role as supervisors. With regard to Fernandez, regardless of whether she was a supervisor, there is record evidence of her participation. Specifically, Fernandez - along with Arnold, Walker, and Faul - decided to reassign Dawson to the warehouse. With regard to Keller, the record evidence is that he was not a supervisor, nor was he a decisionmaker in the employment decisions affecting Dawson.

There is a genuine issue of material fact as to whether Fernandez caused the retaliation against Dawson. The same is not true of Keller. Therefore, as to count V, I grant summary judgment for Keller, and I deny summary judgment for Fernandez.

IV.

For the foregoing reasons, defendants' motion for summary judgment is granted in part. I grant summary judgment for defendants on the Title VII, § 1981, and § 1983 hostile work environment claims based on racial harassment in counts I, IV, and V, for the City on count IV, and for Keller on count V. I deny summary judgment for defendants on count III, and for Fernandez on count V.

ENTER ORDER:

_Elaine E. Bucklo_
Elaine E. Bucklo
United States District Judge

Dated:    August 27, 2009